UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| NATASHA WALKER, | ) | |
| --- | --- | --- |
| | ) | No. 13 CV 5209 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration, | ) ) ) | |
| | ) | October 21, 2015 |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

Natasha Walker applied for disabled adult child's insurance benefits and supplemental security income ("SSI") based on her claim that an assortment of limitations stemming from, among other things, a childhood heart transplant, insulin-dependent diabetes mellitus, and a learning disability render her completely disabled. After an administrative law judge ("ALJ") denied her applications and the Appeals Council declined her request for review, Walker filed the current lawsuit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Walker's motion for summary judgment is granted, the government's motion is denied, and the case is remanded for further proceedings consistent with this opinion:

**Procedural History**

In June 2010 Walker applied for SSI and disabled adult child's insurance benefits, claiming a disability onset date of April 1, 1997. (Administrative Record

"A.R." 203.) After her claim was denied initially and upon reconsideration, (id. at 122-25), Walker requested and was granted a hearing before an ALJ. That hearing took place in two parts, with Walker testifying on July 26, 2011, and with two medical experts and a vocational expert testifying on January 17, 2012. (Id. at 36-121.) On March 27, 2012, the assigned ALJ denied Walker's applications. (Id. at 137.) When the Appeals Council declined review, (id. at 1-3), the ALJ's decision became the final decision of the Commissioner of the Social Security Administration, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Walker then filed this lawsuit seeking judicial review of the Commissioner's decision, *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, s*ee* 28 U.S.C. § 636(c); (R. 10).

**Facts**

The voluminous medical record Walker submitted in support of her disability claims reveals a long and complex medical history, stemming back to a heart transplant she underwent just before her 12th birthday in response to end-stage cardiomyopathy. (A.R. 352.) In the years that followed, Walker not only required annual cardiac catheterizations, but she underwent treatment for a number of other medical problems, including lymphoproliferative disorder, drug-related diabetes mellitus, kidney failure, gallstones, and encephalitis. (Id. at 307, 762, 1239.) Despite the disruption these conditions caused in Walker's life, with the help of a special education program she graduated from high school in 2010 and then enrolled in community college. (Id. at 96-99, 830-31, 993.) Just before Walker

turned 19, she filed the current applications for disability benefits, claiming that her medical conditions preclude full-time work. (Id. at 203.)

In the current motions the parties focus their arguments on what Walker characterizes as the ALJ's failure to properly account for dexterity problems in her right hand. The parties also dispute the supportability of the ALJ's credibility assessment. Because the ALJ's determinations with respect to credibility and right-hand dexterity are the only sources of controversy here, what follows below is an overview of the voluminous medical record that focuses on the evidence relevant to those two issues.

**A.    Medical Evidence**

In the spring and summer of 2009 Walker and her mother met with a nurse to discuss her compliance with her diabetes medication regimen. (A.R. 618.) Although Walker demonstrated knowledge regarding use of a flex pen and her need to check her blood glucose, her mother reported that Walker was often off-schedule with her medications. (Id.) Two months later Walker met with a psychiatrist and reported that she alone was responsible for her treatment. (Id. at 555.) She denied difficulty managing her medications, although she agreed that at times it could be overwhelming. (Id.) The psychiatrist wrote that Walker demonstrated an appropriate understanding of her condition and recommended that she be given more control over treatment decisions. (Id. at 556.) But in January 2010 a pharmacist at Children's Memorial Hospital reported after meeting with Walker

that she needed "much assistance and close follow-up as an outpatient to increase knowledge of her medication regimen and improve her adherence." (Id. at 701.)

Walker's difficulty with treatment compliance extended into 2010 and 2011. In August 2010 Walker told her doctor that she had stopped taking the insulin needed to treat her diabetes for five months, although she had restarted the month before. (Id. at 756-57.) She said she stopped taking the insulin in the hope of losing weight. (Id.) In January 2011 Walker's mother reported frustration with Walker's failure to take responsibility for learning how to handle her medication regimen and said that she had to set up the medications herself to make sure Walker got the right doses. (Id. at 1005.) After Walker suffered a fainting episode in July 2011 her cardiologist reported that her diabetes was "poorly controlled, likely due to non-adherence." (Id. at 953.) Specifically, he reported that Walker admitted that she did not check her blood glucose levels consistently and that she took her insulin only when she felt shaky or had a headache. (Id. at 949.) The following month Walker reported to a nurse that she had stopped taking insulin because she could not afford the co-pay. (Id. at 1328.)

In January, June, and October 2011 Walker reported that she was looking for a job but having trouble finding one. (Id. at 996, 1004, 1351.) In August 2011 Walker told a nurse that she was looking into enrolling in cosmetology school. (Id. at 1329.) Her cardiologist wrote a letter to the Social Security Administration in July 2011 describing Walker's ability to care for herself as "questionable," and reporting that "she may have considerable difficulty maintaining a schedule for

4

employment." (Id. at 946.) He also wrote that "[a]dherence to follow up of Natasha's daily care requires the direction and supervision of a parent." (Id.)

There are also several records that speak to Walker's claim that she has limited dexterity in her right hand. In August 2009 Walker underwent an annual biopsy and coronary angiography, during which she endured the minor complication of an infiltrated IV in her right forearm. (Id. at 359, 433.) She was advised to return for evaluation if the swelling from the infiltrated IV resulted in any "redness, pain or decreased sensation in the forearm or fingers." (Id. at 433.) In July 2011 Walker met with neurology fellow Dr. Alexandra Shaw, who reported that Walker's "rapid alternating movements [were] slow but precise in [the] right hand, however [this] soon gave way to stiffening and clenching of the right hand that took . . . 1-2 seconds to resolve." (Id. at 970.) Dr. Shaw opined that this was "a likely focal dystonic reaction related to injury of the basal ganglia during the patient's episode of encephalitis." (Id.) Walker reported to Dr. Shaw that she had experienced hand cramping since her 2005 episode of encephalitis. (Id.) Accordingly, Dr. Shaw recommended that she be evaluated to determine whether her focal dystonia should be treated with Botox injections. (Id.) The same day, a second neurologist, Dr. Leon Epstein, noted that Walker reported that her hand cramps easily with use. (Id. at 1239.) He observed that she was able to grip a pen only "coarsely," but that she could not type with her right hand. (Id.)

The record also includes the report of a consulting state physician, Dr. Julia Kogan, and residual functional capacity ("RFC") assessments completed by two

state physicians who reviewed the medical record. In August 2010 Walker reported to Dr. Kogan that she has decreased strength in her right extremities that she ascribed to childhood "paralysis." (Id. at 801.) Dr. Kogan noted that Walker's grip strength was 5/5 bilaterally and her ability to perform fine manipulation was intact. (Id. at 803.) Dr. Kogan further reported that Walker had no difficulty standing, bending, sitting, or handling small objects. (Id. at 804.) Shortly thereafter consulting physician Dr. Francis Vincent filled out an RFC form opining that Walker can stand, sit, or walk for six hours out of an eight-hour day, is unlimited in her ability to push and pull, can occasionally lift 20 pounds, and has no manipulative or environmental limitations. (Id. at 808-11.) Consulting physician Dr. Charles Kenney gave a similar opinion in his RFC assessment, although he added environmental limitations including the need to avoid exposure to extreme cold, heat, fumes, and hazards. (Id. at 823-26.)

**B.    Walker's Testimony**

During her July 2011 hearing before the ALJ, Walker described how her various impairments impact her daily life. She said that because of her cardiology issues, she gets tired after walking only a block, can lift and carry only five pounds, and can sit for only five to ten minutes before her legs start to shake and she has to get up and walk around. (A.R. 100, 102-03.) Walker reported that she naps twice a day and does not go anywhere by herself. (Id. at 101, 103.) As for her dexterity issues, Walker testified that her right hand was never the same after her 2005

6

episode of encephalitis. (Id. at 104.) She said that her hand cramps up and prevents her from being able to write well. (Id.)

As for her daily activities, Walker testified that she had just finished a summer semester of community college, where she received no special supportive services. (Id. at 97-99.) Walker explained that she took four classes, including a dance class and an English class that required her to write several papers. (Id.) She reported that she passed English and dance but failed music and a skills class. (Id. at 98.) Walker said that in 2009 she had been employed briefly at Six Flags as a ride operator but was let go before she completed the training program because she was unable to meet the job's standing requirements. (Id. at 96-97.) Walker described having concentration problems that make it difficult for her to learn and remember, but testified that she recently had learned to follow her diabetes treatment plan on her own after previously relying on her parents for help. (Id. at 106-08.)

C. **Medical Experts' Testimony**

After receiving additional medical evidence, the ALJ held a supplemental hearing in January 2012 at which he heard the testimony of two medical experts: Dr. Ronald Semerdjian, an internal medicine specialist; and Dr. Michael Rabin, a clinical psychologist. (A.R. 38.) The ALJ asked Dr. Semerdjian a number of questions directed toward Walker's right-hand dexterity. Dr. Semerdjian testified that based on Dr. Shaw's notes regarding Walker's hand cramps that "there's a loss of fine movement in the right hand" and "some loss of dexterity." (Id. at 48.) When

7

asked specifically about dystonia, Dr. Semerdjian described that condition as abnormal muscle tone comparable to cramping of the muscles and explained that it creates an abnormal tension that may be intermittent. (Id. at 51.) He further explained that dystonia would cause Walker's fine movements to be unpredictable or impaired. (Id. at 56.) Dr. Semerdjian described the record evidence of Walker's dystonia to be conflicting, because the examination performed by the consulting examiner showed no limits in her fine manipulation while the neurologists who examined her saw enough evidence to justify referring her for treatment. (Id. at 62-63.) When asked to describe how dystonia would functionally limit Walker, Dr. Semerdjian said "[d]exterity of the right hand would be compromised" and testified that "if there's enough clumsiness in the right hand" she should be limited in using hazardous machinery or being exposed to unprotected heights, and should not engage in climbing. (Id. at 62.)

Turning to Dr. Rabin, the ALJ asked him to describe the limiting impact, if any, of Walker's cognitive and mental health issues. Dr. Rabin testified that her only mental health diagnoses are borderline intellectual functioning, a learning disability in math, and poor speed processing. (Id. at 78.) He explained that her speed processing issue is not severe enough to preclude work, but testified that she would need simple work without too much stress. (Id. at 79-80.) Dr. Rabin recommended that Walker be limited to work where she could do the same job every day without much learning involved. (Id. at 80.)

8

## D. Vocational Expert's Testimony

Finally, the ALJ elicited the testimony of Vocational Expert ("VE") Margaret Ford. The ALJ asked the VE to consider whether any jobs would be available to a hypothetical individual who was limited to jobs at the sedentary level with restrictions against working around unprotected heights or heavy equipment and operating machinery, where only level surfaces are present and where the work is routine and involves no team coordination or more than a sixth grade math level or ninth grade reading level. (A.R. 83.) The VE testified that such a person could work as a dowel inspector, table worker, and sorter. (Id.) When asked to add a limitation impacting fine fingering and dexterity, the VE testified that none of the jobs she described would be available because they all require fingering on a frequent basis. (Id. at 85-86.)

## E. ALJ's Decision

On March 27, 2012, the ALJ issued a decision finding that Walker is not entitled to SSI or disabled adult child's insurance benefits. (A.R. at 137.) In applying the standard five-step sequence for assessing disability, *see* 20 C.F.R. § 416.920(a)(4); *Schomas*, 732 F.3d at 706-07, the ALJ found at step one that Walker had not engaged in any substantial gainful activity since her alleged disability onset date. (A.R. 131.) At step two the ALJ found that Walker has the following severe impairments: status post 2003 heart transplant and 2005 inferior vena cava filter placement, cardiomyopathy NOS, insulin-dependent diabetes mellitus, obesity, history of colitis, status post ileostomy, learning disability, and

borderline intellectual functioning. (Id. at 131-32.) The ALJ discussed Walker's right-hand cramping at step two, but concluded that this impairment is not severe based on records indicating she has a full range of motion in all extremities, had not been treated for the condition, and had planned to attend cosmetology school. (Id. at 132.) At step three the ALJ found that none of Walker's impairments are of listings-level severity, either individually or in combination. (Id.) Before turning to step four, the ALJ determined that Walker has the RFC to perform sedentary work, "subject to no work around unprotected heights, heavy equipment or operating machinery; no work requiring team coordination; and the need for work that the claimant primarily can perform alone, which is routine and stays the same day-to-day." (Id. at 133.) Turning to step four, the ALJ concluded that Walker has no past relevant work, but at step five, the ALJ determined that Walker's RFC would allow her to work as a dowel inspector, table worker, or sorter. (Id. at 135-36.) Accordingly, the ALJ concluded that Walker is not disabled and denied her applications. (Id. at 137.)

## Analysis

In challenging the ALJ's decision, Walker argues that the ALJ committed reversible error in the course of analyzing her credibility and in failing to incorporate into the RFC assessment limitations stemming from her right-hand dexterity loss. This court reviews the ALJ's decision only to ensure that it is free of legal error and supported by substantial evidence. *See Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). Evidence is considered substantial if a "reasonable mind

10

might accept [it] as adequate to support a conclusion." *Id.* (quotation omitted). This court's role is not to reweigh the evidence or substitute its own judgment for the ALJ's, but rather to ensure that the ALJ constructed a logical bridge between the evidence and his conclusions. *See Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

A.  **The Credibility Assessment**

The court will start with the parties' arguments with respect to the ALJ's credibility analysis because an erroneous credibility finding typically requires a remand. *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014). The ALJ gave a number of reasons to explain his determination that Walker's testimony is not fully credible, including a mismatch between Walker's daily activities and her claimed level of impairment, her failure to take ownership of or follow through on her treatment regimen, her admission that she was looking for a job at the same time she was claiming to be totally disabled, and evidence showing that she told a doctor she was able to jog, swim, ride bikes, and dance. (A.R. 134-35.) An ALJ's assessment of the claimant's credibility is entitled to special deference. *Castile*, 617 F.3d at 929. "Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quotation omitted).

In challenging the ALJ's credibility assessment Walker first argues that the ALJ erred in using the oft-criticized bit of boilerplate stating that the claimant's

11

statements "are not credible to the extent they are inconsistent with the assessed residual functional capacity." (A.R. 134.) Although the Seventh Circuit has derided such language as being "opaque" and "meaningless," *see Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012), it has also held that its use "is innocuous when, as here, the language is followed by an explanation for rejecting the claimant's testimony," *Schomas*, 732 F.3d at 708. Because the ALJ offered several reasons for discounting Walker's testimony, the court will examine those reasons to ensure that they are grounded in evidence. *See Moore*, 743 F.3d at 1122; *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

Walker acknowledges that the ALJ found her testimony that she was inactive and could not walk more than a block to be inconsistent with evidence that she reported to her doctor that she "enjoyed jogging, bike riding, swimming and dancing," but argues that the ALJ erred in failing to make any findings about how often or for how long she engaged in such activities. (R. 18, Pl.'s Mem. at 10.) This argument invites the kind of nit-picking and second-guessing that the Seventh Circuit rejects when it comes to judicial review of an ALJ's credibility assessment. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010.) And in any event, Walker herself admits that the records show she rode a stationary bike for 35 minutes twice a week. The ALJ was well within the limits of reasonableness to find a clash between that evidence and Walker's testimony that she could not walk for more than a block or sit for more than 10 to 15 minutes. *See Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008) (noting that claimant's regular exercise supports adverse

credibility finding). Walker also asserts that she failed her summer dance class, but points to no evidence that her physical limitations were behind that failure, and again, the ALJ was entitled to view Walker's decision even to enroll in a hip-hop class to be inconsistent with her hearing testimony regarding her physical limitations.[1] Walker further notes that Dr. Semerdjian limited her to four hours of walking and standing a day based on evidence of her deconditioning, and argues that this evidence supports her account of her physical abilities. But this court may not reweigh the evidence or substitute its judgment for the ALJ's, so whether Dr. Semerdjian's findings support or discredit Walker's testimony that she can walk only a block is a call for the ALJ to make. *See Jones*, 623 F.3d at 1162. Because the ALJ found that Walker's testimony was significantly different than her reports to her doctors, and that finding is supported by the evidence, this aspect of the credibility decision is not patently wrong. *See Elder*, 529 F.3d at 414 (noting that ALJ has authority to disregard claimant's testimony where conflicts with what she told doctor).

Next Walker argues that the ALJ committed reversible error in holding against her the fact that she repeatedly told doctors that she was looking for work at the same time she was seeking disability benefits. (R. 18, Pl.'s Mem. at 11.) It is true that an ALJ should tread lightly in holding against a claimant her decision to

---

[1] It also is unclear that this argument is supported by Walker's testimony. Walker testified that she took four college classes: music, dance, English, and skills. (A.R. 98.) She testified that she did "fine" in two of the classes, but failed music and skills. (Id.) Her testimony thus implies that it was the music class, not the dance class, which gave her trouble.

13

continue to look for work or to seek unemployment benefits while a disability claim is pending, but relevant caselaw allows an ALJ to give some consideration to such activity. *See Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014). As long as an ALJ includes the claimant's search for work among a list of factors relevant to the credibility determination, that search may play a role in the ALJ's weighing of the evidence. *See Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). Because the ALJ provided a number of reasons here, he was entitled to consider the discrepancy between Walker's hearing testimony and her job search in the course of assessing her credibility.

Walker also argues that the ALJ erred in failing to account for the decreased demands of her special education program before finding a mismatch between her ability to complete those courses and her testimony about her ability to engage in competitive work. (R. 18, Pl.'s Mem at 12.) But the ALJ acknowledged Walker's struggles with math and reading as well as the fact that she received special support in school. (A.R. 135.) He also noted that Walker's teachers found that she has no marked limitations in the relevant domains and that she had enrolled in college classes. (Id.) The ALJ acknowledged the evidence that Walker works slowly, which is consistent with her testimony, and accounted for that fact by limiting her to work that she can perform alone, that is routine, and that remains the same day-to-day. (Id. at 133, 135.) Walker has not explained how this aspect of the credibility analysis or the RFC conflicts with her testimony, which includes her description of passing an English class which required her to write several papers

without special supportive services. (Id. at 98-99.) Accordingly, the ALJ did not err in factoring Walker's educational background into the credibility assessment.

Finally, Walker faults the ALJ for holding against her the fact that she went for significant periods without seeing a primary doctor and was often noncompliant with her diabetes treatment protocol. (A.R. 134-35.) Specifically, the ALJ noted that in August 2010 Walker "had not seen a doctor in quite some time, and acknowledge[d] being off insulin [for] eight months," and that in October 2011 she had no primary physician and had "only recently begun to take 'increased ownership' of her medication regimen." (Id.) Walker argues that the ALJ should not have held her failure to obtain a primary doctor against her because she continually received care from specialists. (R. 18, Pl.'s Mem. at 11.) She also argues that the ALJ should have considered whether her cognitive limitations contributed to her failure to follow her diabetes treatment regimen. (Id. at 11-12.) A claimant's failure to accept treatment is a reason to think she may be exaggerating her symptoms, *see Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015), but before holding that failure against Walker the ALJ should have considered any explanations, including what her doctor described as her questionable ability to care for herself, *see Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013); (A.R. 946).[2] Although that shortcoming in the ALJ's credibility assessment gives the court pause, the Seventh

---

[2] It should be noted that Walker reported at least once that she had stopped taking insulin in an attempt to lose weight, suggesting the lapse was intentional rather than the result of cognitive limitations. (See A.R. 756.) But because the ALJ did not consider that evidence it plays no role in the court's review of the credibility assessment.

15

Circuit has made clear that not all of the ALJ's reasons for disbelieving a claimant have to be valid "as long as *enough* of them are." *See Halsell v. Astrue*, 357 Fed. App'x 717, 722 (7th Cir. 2009) (emphasis in original); *Jones*, 623 F.3d at 1161. Here the ALJ's failure to fully flesh out his analysis of Walker's treatment history is buoyed by the numerous other supported explanations he provided for discounting Walker's testimony. Accordingly, this court finds that there is no reversible error in the ALJ's credibility assessment.

**B.     Evidence of Loss of Right-Hand Dexterity**

Walker also argues, this time persuasively, that in crafting the RFC and analyzing the availability of work at step five the ALJ improperly evaluated the evidence regarding her right-hand dexterity problems. Specifically, she argues that the ALJ committed reversible error in failing to consider her right-hand impairment in combination with her other impairments in crafting the RFC. An ALJ is required to consider the combined effect of all of a claimant's impairments regardless of whether each individual impairment would be of disabling severity taken by itself. 20 C.F.R. § 416.923; *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). In other words, once the ALJ finds that the claimant has at least one severe impairment, he is required "to consider the *aggregate* effect of this entire constellation of ailments—including those impairments that in isolation are not severe." *Golembiewski*, 322 F.3d at 918 (emphasis in original).

Here, although the ALJ analyzed the evidence of Walker's right-hand impairment at step two and determined that it is not severe, he never discussed in

16

his RFC analysis how that impairment impacts Walker in combination with her other impairments. Although the court reviews the decision as a whole and does not require the ALJ to create "tidy packaging" at each step, *Buckhanon ex rel. J.H. v. Astrue*, 368 Fed App'x 674, 678-79 (7th Cir. 2010), the ALJ's treatment of the issue is puzzling, given that the discussion at step two shows that the ALJ believed Walker has some level of limitation related to right-hand dexterity, just not a severe one. Specifically, he acknowledged that a neurologist who examined her in July 2011 observed clenching and stiffening of the right hand with rapid alternating movement, and that this was likely attributable to focal dystonia. (A.R. 132.) That evidence is backed up by the testimony of Dr. Semerdjian, one of two medical experts who testified in January 2012, who reviewed the record and concluded that although the 2011 neurological exams do not imply "a significant degree of impairment of function," the record nonetheless suggests that the dystonia would be persistent and would cause Walker's fine movements to be unpredictable or impaired. (Id. at 55-56.)

Although Walker does not challenge the reasons that the ALJ gave for finding at step two that her right-hand limitation is not severe, she persuasively argues that the ALJ's failure to factor her dexterity issues into his discussion of the RFC renders his step-five analysis unsupported. At the RFC stage, the ALJ did not expressly discuss her right-hand dexterity at all, either as a singular impairment or with respect to how it impacts her in combination with her other impairments. The only restrictions the ALJ incorporated into the RFC that are related to this

impairment include prohibitions against working around unprotected heights, heavy equipment, or operating machinery. (Id. at 133.) The government defends this aspect of the ALJ's decision by pointing out that the prescribed environmental restrictions are the only ones Dr. Semerdjian discussed in connection with Walker's hand dexterity problem. (R. 23, Gov't's Mem. at 4-5.) But the ALJ specifically asked Dr. Semerdjian whether he has any way to predict whether the dystonia would impact "her ability to handle, hold, or finger," and he testified that if the neurologist's exam is accurate, Walker's strength is adequate but "her fine movements, as I mentioned earlier, would be impaired or, at least, they would be unpredictable, with this dystonia." (A.R. 56.) He further testified that dexterity in Walker's right hand would be compromised. (Id. at 62.) But other than the environmental limitations, the assigned RFC does not account at all for manipulative limitations, most relevantly, any limitation in fingering. Even if the ALJ considered the evidence of Walker's right-hand impairment to be sparse, because he acknowledged it as a limitation at step two, he was not free to dismiss it without explaining how it factored into his RFC and step-five assessments. *See Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994).

The ALJ's oversight with respect to the fine movement limitation is not harmless because the VE specifically testified that any impairment impacting Walker's fine fingering or hand dexterity would eliminate the jobs of dowel inspector, table worker, and sorter, which are all jobs requiring frequent fingering. (A.R. 83, 85-86.) Those are the very jobs that the ALJ found to be appropriate for

Walker at step five. (Id. at 136.) Accordingly, the case must be remanded to allow the ALJ to explain how Walker's right-hand dexterity issues factor into her RFC and to reevaluate whether any jobs are available to an individual with that RFC.

## Conclusion

For the foregoing reasons, Walker's motion for summary judgment is granted and the Commissioner's motion is denied. The matter is remanded for further proceedings consistent with this opinion.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**